Good morning, Your Honors. My name is Penelope Strong, and I represent the youth D.R.L. This case presents a serious issue in terms of the, what we call the abuse of discretion by the judge who fashioned a disposition for D.R.L. that we argued ignored the rehabilitative purpose of the Federal Juvenile Justice Act. Dovetailing into that was the judge's biased, impartial questioning of certain witnesses, and then his final determination that D.R.L. did not exhibit remorse to a sufficient degree as he would have liked, and as well that D.R.L. was not entitled to an acceptance of responsibility determination. That, despite the fact that the plea agreement the government stipulated to acceptance of responsibility, and that we all know that folks who plead guilty exhibit, if you will, implicitly remorse and acceptance by their pleas of guilty, and as well, the probation officer in the pre-sentence investigation also recommended for an acceptance of responsibility. And I would like to point out for the record that although D.R.L. was late, extremely late in submitting his written statement, the pre-sentence does indicate that verbally in the meeting with the pre-sentence officer, he did accept responsibility. Let me ask you a few questions about the judge's role in questioning the witnesses. Now, the judges don't sit there as a, you know, as a bump or a stump in a log, you know, just some figurehead there. Judges often ask questions, and as a former district court judge, I often ask questions. In fact, I often ask the government, I want you to present a witness that I think would be critical to my determination on the sentence I might want to fix. What was so offensive about what the district court judge did here? It looked to me like he was just trying to clarify certain matters, making sure he had the correct information. You may not like his ultimate decision, but we'll talk about that in a minute. Well, he does say at one part in the short answer, he was partial and he was biased and he took a partisan role. At one point when he and I had a colloquy later on, he said, Ms. Strong, I was just trying to determine the timing of the apology letter or the letter accepting responsibility. Well, that's not so. He questioned my client's father with regard to how about the victim here and what do you think should happen to her? There wasn't any clarification of that. On that, I thought as I read it, the child's father said something like he should be released, put on probation and just sent home and that that should be adequate. And the judge questioned that and said, well, how would you feel about it if you were the victim's father? So what is the problem with that? He's trying, the judge is in the role of the trier of acting decision maker at the hearing. Why can't he ask probing questions like that? Well, with all due respect to the The cases you cited, I thought, were primarily cases that talk about the judge's neutral arbiter, neutral role when the judge is the, is presiding over a jury trial and any little whisper might push the jury one way or the other. But in a bench trial, what's wrong with that kind of question? In my practice, it happened a lot. What's wrong with it? And I'm looking at that part. He said, I have a question. What would you want done if you were sitting in that chair right here as the father of the victim? What would you want done to this young man? I think that's taking a partisan, I think that's taking a prosecutorial role, and that was echoed throughout all of his questioning. None of his questioning was to clarify, for example, with Dr. Bacow, would this be more appropriate? Would that be more appropriate? It was all hinged on the credibility determinations, which we know get wrapped up in the MMPI and the different type of scales that they use. Later on, Your Honors, when he finally made his determination and the disposition, he talked largely about he misread the letters of support that came in. There was a comment in one about the victim. He said that he saw that type of attitude throughout all of the letters, and he was  Well, we know when you go to a juvenile disposition hearing or an adult sentencing, you are focusing on the offender with no disrespect intended to victims. You're looking at all of their needs, the panoply of evidence that comes in, expert and lay, and you're trying to fashion an individualized determination. But for both adults and juveniles, it's at the heart of this. And the remorse finding that he made also ignores trauma and adolescent psychology I pointed out in the record to the Court with Dr. Bacall. I thought it ignored the typical affect that we see in Northern Plains Indians. Lastly, we felt, and I believe that it was very problematic. Think about the sentence itself. He did he placed him on probation for until he turned 21. And as a condition of probation, he had to spend the first two years in a juvenile justice facility, and he recommends that he be placed at Siebel. Oh, I'm sorry, Galen. Galen is the name of the facility. And the judge says that during the time of his incarceration, he's required to participate in a sex offender program, an alcohol program, a drug program, and all the other sort of rehabilitative kinds of programs that might be beneficial to this young man. All right. What's wrong with it? Why wasn't that? First of all, a technical problem that I didn't address and I should have, which is putting someone on probation and then ordering two years' confinement is not a sentence of a disposition of probation with all due respect. I wish I had addressed that. Is there a case that says that? No, but I think if you look at the logic and the statutory construction and what we know of putting people on probation, probation generally means that they are free. Not necessarily. You could say, you know, you're placed on probation and you're going to spend 90 days on home detention. You're going to spend a year at a residential treatment facility as a condition of probation. Here he just said you're going to spend two years in a juvenile facility closest to his home. Well, I think that you can – I have seen cases, Your Honor, where you can do the home detention, but frankly, any time you incarcerate in a jail or a prison, then you're talking about a parole or an aftercare supervision, not the word probation. What would the sentence be? In your client's view, what would have been a sentence that would not be an abuse of discretion? It would have followed Dr. Bacow's recommendation and my recommendation in the sentencing memorandum to keep this young man in his home. He had outpatient treatment both for alcohol and sex offender type of programming available in the Billings area, which is less than an hour from his home. His father testified. His father is a schoolteacher, very knowledgeable, testified that he would be supportive and make sure that he exhibited strict parental discipline so that DRL would attend all that probing and follow-up. Furthermore, our further argument was that the gender of the parent was important to the degree, and Dr. Bacow supported that determination in terms of his being a sex offender and the need to relate to his son. I don't recall the doctor's recommendation being that he remain at home. He should enter and complete specialized treatment for sexual offenders with a provider approved by the Montana Department of Corrections and or a clinical member of the association. He should complete a thinking heirs program, anger management. He should have no contact with the victim. He should lead an alcohol and drug-free lifestyle. He should participate in an alcohol or drug abuse counseling program. He is to use no sexually explicit material. I believe that he should stay at home. You – I may have mischaracterized what his final recommendations were, but I believed in the line of questioning that I had for Dr. Bacow. I asked him about our plan, staying with the father, switching custody to the father, and I believe that Dr. Bacow said that would be a good idea in his mind. And Dr. Bacow, in his testimony, Your Honor, also did specify the south central sex offender treatment program and billings. He said, I do treatment because I did his evaluation. I certainly cannot treat him. Let me just ask you one other minor question. This facility in Galen, is that near his home? It's about five hours one way from his home. Billings would be within an hour of his home. Is that the closest juvenile justice facility? I believe that it is, and it does have a facility. Does that facility have, you know, these kinds of programs, sex abuse programs? It does, but it is. Drug programs, alcohol programs, treatment programs? It does. It is a secure program. Lastly, I would like to say that the judge made some orders that related to not having contact with children under the age of three. This is a peer-related sex offense. The other gross abuse of discretion was the judge mentioned when I questioned it, he started it all. That is not true. He had a brother with a similar first name. I believe the judge may have confused that. The judge may have thought that with regard to certain allegations of anal intercourse and insertion of a bottle in the victim's vagina, that my client did those things, but he made no specific findings. And that's an abuse of discretion, because if he was thinking that, he did not clarify it and make it explicit for this record. And my client denied those allegations both. Let me ask you one last question before you sit down. Our recent case, United States v. Juvenile, that was just handed down a couple weeks ago, how does that help you here? That helps us because the judge said, I'm a firm believer that deterrence and punishment are part of the juvenile system, and your system, your decision clarifies that in that regard. And that was one of our arguments in the report. I don't recall there being a ruling that only rehabilitation is the only purpose. Is that what you say that opinion stands for? No, that's not what I'm saying. In that case, you know, it was a kid, I forget, whether he was 15 or maybe 15 or around that age and then sentenced to be in a facility until he was 21 with maybe no treatment or a year and a half of treatment. And I thought the majority of the panel, from which I dissented, had took the view that this was just too much incarceration, too much punishment and not enough rehabilitation. But here, if he's on probation, he's out of the facility after two years, and he's got treatment all the time he's in the facility. So how would that case help your side? Well, it does help us because we think that Judge Siebel, with all due respect, issued a largely punitive order. He regarded DLR as a mini-adult in the assessment of acceptance of responsibility and remorse. And lastly, I am looking at the holding in U.S. v. Juvenile, and you're saying that the primary purpose is to rehabilitate children, and there's good language about, furthermore, looking at the least restrictive alternative. Judge Siebel clearly did not do that. This case needs to go back on remand so that the judge can clarify and develop a well-reasoned articulation, as the language also says in U.S. v. Juvenile, and look at the totality of the circumstances. C.K. was a moderate-risk offender with a horrible history of being a victim. My client was a completely clean offender for the most part, no alcohol problems except for this incident, and a low-risk offender. Thank you very much. Thank you. Good morning, and may it please the Court. I'm Marcia Hurd, and I was the attorney who handled this case in the district court below, and I also did the briefing. I also handled the C.K. case, United States v. Juvenile, that was just issued, so I'm somewhat familiar with that opinion and the facts in that case. We believe in this case that the district court was squarely within its discretion in the sentence that was issued to the juvenile in this matter. This case is much different than what happened in the C.K. case. In C.K., the juvenile was actually 14 at the time of the disposition. This young man was 16. What happened to D.R.L. was a probationary sentence with a recommended placement for two years at Galen, which is the facility closest to his home. It was not available at the time. It's a new probation facility. It is. It's a brand-new facility that's been opened in Montana that was not available at the time C.K. was sentenced. At that time, we were sending kids to the California Youth Authority and sometimes off to Texas. Now, counsel for D.R.L. makes an interesting argument, because in Enright Juvenile, the court does distinguish sentences of imprisonment from sentences of imposition of probation with conditions. That's true. And she didn't make it in her brief, so quite possibly, probably it's waived. But it is an interest. I mean, how do you characterize the sentence here? I mean, is it probation with confinement? Is that a hybrid? Is that permitted? Your Honor, I think you're correct that she did not raise it. It would be an interesting issue to brief, because that's a very standard sentence, especially in the District of Montana and in the districts probably also of Arizona and New Mexico, where we have a lot of juvenile Native American offenders, where probation and some condition thereof is often this type of a sentence. And especially here, where it seems that the judge did not err in finding that returning D.R.L. to his community would not serve the rehabilitative purposes of the act. That's correct. It's very much in accord with what you all set down or the panel set down in C.K., is look at the community as well. And the judge brought that squarely to the forefront, that it would not be in the best interest of this youth or his community for him to return. I'm sorry? Does the judge actually say that? He says at the very end of his sentencing, which would be in the record after there's a discussion by the United States about their recommendation. What page is this? If we're looking at the record, it's page 98. And the judge is doing his colloquy and kind of thinking out loud about, I don't understand. Page 98? Yes. The supplemental excerpt of record. The transcript was not in the original excerpt of record, and so I filed it as an S.E.R. I think I've got it here. I don't know. I've got the original transcript, but my only goes to page 60. Page 64 on the original transcript. 64? Okay. I've got it. I've got it. The judge is kind of thinking out loud, and he's thinking about the offender evaluation that was done here, where this young man, after he is pled guilty and in front of the person who's going to stand up in court and make a recommendation, calls this young woman that he has raped a whore and shows absolutely no remorse or acceptance of his responsibility in this role. And the judge says, I don't understand. I don't understand this kind of attitude at the top of the page. He goes on to talk about the letters that basically say there's no credibility in this victim's testimony. And at the very end, he said on line 21, how, if I send him back immediately to that environment, how is this going to take, make him take responsibility? I can go on and on about the discrepancies in this case, and the fact it's most impressive, if you go on to the next page, is his failure to take any responsibility for himself. And then he says, I am a firm believer in the proposition that even under the juvenile system of justice, punishment and deterrence are purposes. And that is not in odds with CK. And as a matter of fact, it goes specifically with the case from this Court, United States v. Juvenile, that's found at 38F3rd 470, which says, the 1984 Act allows this Court to consider punishment in shaping conditions of probation as long as those conditions are reasonably related to sentencing factors. In this case, he sent him to a juvenile facility closest to his home for specialized sex offender treatment, which he's obviously in need of, alcohol treatment. He's also saying this is the least restrictive alternative? I don't think he specifically said that, but he certainly rejected the proposal by the defense, which was, I'm going to go home with my dad, I don't need to be punished in any fashion, and I will just be in my community. And so I don't think he uses those specific words anywhere, but I think it's very implicit in his discussion and his kind of talking out loud about how on earth could I just send him back home to this kind of an environment with the kind of attitude that he has. And so I think he has made the discussion that C.K. sets forth about least restrictive alternative. Plus, we have to keep in mind, he's not committing him. He's placing him on probation, which is a very different situation than in C.K. And the factors don't... How is that explained to me, though? He's still incarcerated, right? What's uniquely different about probation and then as a condition of probation he's placed in this facility? What is why is that so different? Several things, I think, Your Honor. And the first is what was really troubling to the court in C.K. was the fact that this was a young man, age 14 at the time of his sentencing, who had an abysmal history of sexual abuse on himself as a victim that he'd been perpetrated upon. He was ordered, committed to the custody of the Attorney General until the age of 21, so a period of about 7 years. And the first 18 months were recommended in treatment, and then there was no discussion afterwards about where he was to go or what he was to do. And the C.K. Court was that there was no supervision, where in this case what the court did was say, you are in need of specialized treatment. I'm going to put you here for that treatment for 2 years, but then you have 3 more years of probation that will be supervision, that will be transition, in order to help you back into the living situation. So I think that's very different. But C.K. wasn't there about 5 years of no detention, far from home, without any treatment? That's correct, Your Honor. In one sense, I mean, I take some issue with the majority opinion in C.K. because the facts were actually that the court's order was commitment until age 21 with a recommendation for placement at our home in South Dakota, which was at the time the facility closest to his home, although that's not made clear from the record, with at least 18 months of recommended treatment. And it doesn't say, and you can't go along farther. And as we all know in these cases, often treatment takes longer than 18 months or even longer than 2 years. The other difference in C.K. is the court found in C.K. that that juvenile took responsibility, and he had been in a treatment facility at Normative Services and had made some progress. In this case, we have a young man who never entered treatment, did not have any treatment in his background, and was very clear, if you look at Dr. Bacall's report, no empathy, no remorse, projected blame, he was in denial, he rationalized, he was resistant to the testing, portrayed himself as unrealistically virtuous. And some of the tests were even so, I guess, off the wall, for lack of a better term, that they couldn't even be considered valid because he – because of his answers. And so I think in this case, the court was well within its discretion, even if you look at the Rule 614 issue, where he didn't call the witnesses, the court didn't, but questioned the witnesses and asked them some clarifying questions. The new Alfaro case that I submitted to the Court by a letter brief on August 12th is squarely on point with this. In Alfaro, the district court actually called, so it's even kind of a little farther to the right, witnesses at the sentencing hearing and examined them, and this Court said that that was fine, as long as the Court remained impartial and disinterested, and noted that the judge allowed cross-examination, which happened here, that the defendant did not challenge the credibility of the witnesses. In this case, these were his own witnesses that he put up, and the judge was bringing out some points that were very troubling to him. The judge did not in this case distort or add to the evidence, which is one of the Alfaro criteria, and the defendant didn't challenge the substance of the testimony. And in this case, again, they were his own witnesses. So I think the Alfaro case found at 336 F. 3rd. 876, which was a Ninth Circuit case decided in July of 2003, is much more squarely on point than any of the cases cited in the brief of the Petitioner regarding Rule 614. If you have no further questions, I've probably taken up enough of your time, and I will sit down. All right. Thank you, counsel. Thank you. United States v. DRL is submitted. We will take up appeals numbers 0235218, 035219, 035261, Bianco v. Erkins. Counsel, just so you know, we would first like to address the matter of the bankruptcy petition in case appeal number 0235218. So would counsel representing, I guess, Robert Erkins and Bianco come to the podium? May it please the Court, my name is Jim Magnuson.
judges: Wardlaw, Gould, Paez